**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANTHONY TINCHER** | ) | |
| Plaintiff, | ) ) | Case No. 13 C 8410 |
| v. | ) ) ) | |
| **CAROLYN COLVIN** | ) | Magistrate Judge Daniel G. Martin |
| Commissioner of Social Security, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Anthony Tincher ("Plaintiff" or "Tincher") seeks judicial review of a final decision of Defendant Carolyn Colvin, the Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for disability benefits and supplemental security income benefits under Title II and Title XVI of the Social Security Act in a July 23, 2012 written decision of Administrative Law Judge ("ALJ") Melissa Olivero. Tincher appealed the ruling to this Court and filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision. The Commissioner filed a cross motion. The Court discusses the record only insofar as necessary to elucidate its ruling. Both parties have ably addressed the evidence relevant to their respective claims.

Tincher alleged that he become disabled on February 1, 2008 and remained disabled through his last insured date of December 31, 2009. ALJ Olivero found that he suffered from the severe impairments of hypertension, obesity, bipolar disorder, and a history of alcohol abuse. None of these impairments met or equaled a listing, either singly or in combination. The ALJ also found that Tincher could perform his past relevant work.

As part of that analysis, she determined that his allegations concerning the severity of his symptoms were not credible. ALJ Olivero also found that Tincher had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels. However, he was limited to carrying out only "simple tasks and should have no contact with the general public, and only occasional contact with co-workers and supervisors." (R. 31). Based on testimony given by a vocational expert ("VE"), the ALJ found that work existed in the national economy that Plaintiff could perform. She therefore concluded that he was not disabled.

Tincher argues that the ALJ erred by incorrectly assessing his credibility and RFC. The second ground raises the additional issue of the weight that the ALJ assigned to the state-agency experts. The Court addresses each issue in turn.

## **Legal Standard**

### A. **The Social Security Administration Standard**

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §

404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

**B. Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).

Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## Discussion

### A. The Credibility Assessment

ALJ Olivero concisely stated the reasons for her credibility finding in a single paragraph. She relied heavily on the fact that Tincher was not always compliant with medical advice. An ALJ is entitled to consider a claimant's compliance with a doctor's instructions when she assesses his credibility. SSR 96-7p; *Ellis v. Barnhart*, 384 F. Supp.2d 1195, 1203 (N.D. Ill. 2005).

The ALJ first criticized Tincher's failure to stop smoking despite medical advice to do so. (R. 33, "During this treatment relationship [with Dr. Kevin Gordon] he was consistently advised to stop smoking, but all treatment notes indicated that the claimant continued to be non-compliant with medical advice."). That was erroneous. The Seventh

4

Circuit has warned that the addictive nature of smoking makes it "an unreliable basis on which to rest a credibility determination." *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000) (stating that an ALJ errs by relying on a failure to quit smoking as evidence of non-compliance). Many courts have found that an ALJ errs by citing smoking as a sign of medical non-compliance, at least in the absence of evidence that it is linked to a claimant's symptoms. *See, e.g., id.*; *Ellis*, 384 F. Supp.2d at 1204; *Carroll v. Barnhart*, 291 F. Supp.2d 783, 796 (N.D. Ill. 2003); *Shewmake v. Colvin*, 2014 WL 2619659, at *9 (N.D. Ill. June 12, 2014). ALJ Olivero did not link smoking to any of Tincher's severe impairments.

The ALJ also criticized Plaintiff because she did not believe he had been compliant with his blood pressure medication. Social Security Ruling 96-7p warns that "the [ALJ] must not draw any inference about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record." ALJ Olivero never asked Plaintiff about his failure to take his blood pressure medication. Moreover, she cited only one instance of non-compliance.

Setting aside the weakness of relying on a single incident, the ALJ could not discount Plaintiff's credibility without inquiring into the matter first and giving him an opportunity to respond. That was especially true in this case because Tincher was unrepresented by counsel at the hearing. He consistently told the ALJ that he could not afford treatment or some of his medications. *See Craft*, 539 F.3d at 679 ("An inability to afford treatment is one reason that can provide insight into the individual's credibility."). As discussed below, moreover, an ALJ must account for how a claimant's mental illness affects his ability to comply with the need to take medication on a regular basis. The ALJ

5

did not consider what effect, if any, Tincher's severe mental impairments had on his ability to take medication regularly.

She also faulted Tincher because he had only seen his treating physician Dr. Gordon four times. The frequency of treatment can be a factor in assessing a claimant's credibility. SSR 96-7p. Again, however, the ALJ was obligated to give Plaintiff an opportunity to explain his reasons. *See Craft*, 539 F.3d at 679; *Crawford v. Astrue*, 633 F. Supp.2d 618, 632 (N.D. Ill. 2009) ("[I]n order to draw an inference about a claimant's condition, an ALJ must first consider the claimant's explanation for not seeking treatment."). *Cf. Brent v. Astrue*, 879 F. Supp.2d 941, 949-50 (N.D. Ill. 2012) ("The ALJ may not play doctor and second guess whether the rate of treatment undermines the very diagnosis."). The ALJ never asked him to discuss anything concerning what she thought was insufficient treatment for hypertension. Additional visits to Dr. Gordon may not have been necessary for the proper treatment of Plaintiff's hypertension. Plaintiff may not have been able to afford to see his physician as frequently as the ALJ seems to have thought he should. Plaintiff's mental illness may also have made it difficult for him to pursue regular treatment. The ALJ never asked the unrepresented claimant in this case to discuss these issues. She could not discount his credibility on this ground without first doing so. The ALJ did approach the issue to some degree concerning Plaintiff's spotty treatment for mental health. Tincher told her that he could not afford more regular treatment or the medications he needed for his bipolar disorder. The ALJ noted that statement. In direct response to the ALJ's question, Plaintiff also told her that he did not pursue free or low-cost mental health treatment. (R. 65). The ALJ relied on that comment to discount Tincher's credibility for irregular mental health treatment.

6

That was erroneous because the ALJ never asked Plaintiff to explain *why* he did not seek out free mental health treatment. For the ALJ knew, Tincher's mental illness may itself have prevented him from pursuing more aggressive treatment. Or he may not have known that free resources were even available to him. The problem is that the ALJ never inquired into the matter. "ALJs have a duty to consider factors like inability to travel, mental illness, or economic constraints that may have prevented claimants from seeking [or] receiving medical care." *Orienti v. Astrue*, 958 F. Supp.2d 961, 977 (N.D. Ill. 2013). Without counsel, a mentally-ill claimant like Tincher may well not have understood that he needed to do more than answer the simple question posed to him by the ALJ.

The ALJ's silence on these issues presents the all-too-familiar scenario in which adjudicators do not comply with the requirements that apply concerning claimants who suffer from mental illness – particularly bipolar disorder. "Courts have long recognized the inherent unfairness of placing emphasis on a claimant's failure to seek psychiatric treatment." *Sparks v. Barnhart*, 434 F. Supp.2d 1128, 1135 (N.D. Ala. 2006) (citing cases). The Seventh Circuit and other courts have – repeatedly – stressed that "mental illness . . . may prevent the sufferer from taking [his] prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) (noting that bipolar disorder may prevent a claimant "from taking her prescribed medicines"). *See also Shiva v. Astrue*, 628 F.3d 346, 351(7th Cir. 2010) (stating that referring to a failure to take medications "ignores one of the most serious problems in the treatment of mental illness – the difficulty of keeping patients on their medications"); *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2006) (stating that "people with serious psychiatric problems are often incapable of taking their prescribed medications consistently"); *White v. Comm. of Soc.*

7

*Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) ("For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself."); *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (explaining that courts "have recognized a mentally ill person's noncompliance with psychiatric medications ca be, and usually is, the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse") (internal marks omitted) (citing cases).

Unfortunately, the ALJ's criticism of Tincher's treatment did not stop with these oversights. She went on to fault Plaintiff because his mental illness never required inpatient care. That was seriously erroneous. Nothing in the regulations or Rulings requires a claimant to receive inpatient care for mental illness in order to be disabled. The ALJ cited nothing to support her apparent assumption that hospitalization, or some other form of inpatient psychiatric care, was necessary for Tincher's allegations to be credible. "[T]here is no requirement in social security law that a claimant require hospitalization in order to demonstrate a severe mental impairment." *Worzalla v. Barnhart*, 311 F. Supp.2d 782, 796 (E.D. Wis. 2004). The Seventh Circuit has noted in strong terms that "[t]he institutionalization of the mentally ill is generally reserved for persons who are suicidal, otherwise violent, demented, or (for whatever reason) incapable of taking even elementary care of themselves." *Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015). The ALJ's assumption that inpatient treatment was necessary borders on a forbidden attempt of playing doctor.

The ALJ further erred by failing to explain why Plaintiff's testimony concerning his activities of daily living ("ADLs") did not support his credibility. He told the ALJ that he sits on the porch all day or watches TV. Plaintiff's mother testified at the hearing that Tincher

8

"hides" inside the house most of the time. He has no social activities. The ALJ seems to have thought that Plaintiff was not credible because he said that he could care for his personal tasks such as grooming. What he actually said was that he could shower, but it left him exhausted. (R. 66). He can also make grilled cheese sandwiches. (R. 67). He goes shopping once a month. His mental illness makes it extremely difficult for him to be around more than a few people at a time. An ALJ cannot rely on such minimal daily activities as a basis for discrediting a claimant without at least explaining the basis of her reasoning. In itself, the highly-restricted functioning that Tincher described is not incompatible with his claim that he cannot work on a sustained basis. A claimant can shower, make sandwiches, and watch TV without being able to handle the physical and mental strains of a full-time job. *See, e.g., Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The Court notes that the Commissioner's motion does not defend the ALJ's decision based on her consideration of Plaintiff's ADLs. The government merely notes that ADLs are part of the evidence that an ALJ may consider.

The ALJ also never explained why she thought that Plaintiff's testimony on his ability to concentrate was not credible. The ALJ concluded that Tincher could "pay attention for extended periods." (R. 34). Her only reasoning was that he spends all day watching TV, works on his computer, and plays computer games. The ALJ provided no logical bridge between these reasons and her credibility finding. It goes without say (hopefully) that watching TV for extended periods of time is not a sign of significant concentration. As for the computer, the ALJ failed to recognize that Plaintiff told her that he was only on his computer for two hours a day. (R. 68). The ALJ did not note that fact, did not ask what it

9

was that he did on the computer, and did not explain why it was evidence of "extended" concentration. She never asked Plaintiff how long he played computer games. She also never discussed his claim that he needs to lie down for at least three hours each day.

The ALJ's most detailed explanation concerning credibility involved alleged inconsistent statements that Plaintiff made about his use of alcohol. Inconsistent testimony is a legitimate ground for finding a claimant to be less credible. SSR 96-7p. In this case, however, the ALJ's reasoning raises several problems that make it less persuasive. Tincher freely admitted that he had problems with alcohol. The ALJ noted that he told medical consultant Dr. Albert Osei in August 2010 that he had not used alcohol since the preceding February 2010. She contrasted that with Plaintiff's alleged statement to psychological consultant Dr. Mark Conard in April 2011 that he had been abstinent since 2009. The ALJ concluded that this discrepancy in dates made Plaintiff less reliable.

The problem with this analysis is that Dr. Conard did not say what the ALJ ascribed to him. He wrote: "the claimant reported that since his health has declined over the past two years he sought substance abuse treatment. . . . He added being abstinent since that time." (R. 439). Dr. Conard never identified 2009 as the time that Plaintiff said he had his last drink. His report merely states that Tincher was abstinent at some unspecified point during the program that he began in 2009. From the face of the report, it could have been at the end of the two-year program just as easily as at the beginning. It is just as logical to conclude that Plaintiff stopped drinking in February 2010 (as he told Dr. Osei) as in 2009. The ALJ's inference that Plaintiff said he had been abstinent since 2009 is nothing but a conjecture for which she cited no valid evidence. The ALJ could have easily clarified the issue at the hearing simply by asking Plaintiff to explain the facts. Instead, she never

10

elicited any information from Tincher on the matter.

The ALJ also cited Plaintiff's mother as evidence on the issue. Ms. Hansel told the ALJ at the April 2012 hearing that Tincher went on drinking binges three to four times each month, and that he had had a problem with alcohol for 12 years. The ALJ failed to explain why this contradicted what Tincher told Dr. Osei or Dr. Conard. The ALJ never asked Ms. Hansel if Plaintiff's drinking was continuous during the 12 year period, or even if he was drinking during the time period that Dr. Osei and Dr. Conard addressed in their reports. Plaintiff might also have made intermittent efforts to stop and start drinking that frequently occur in recovery programs. For all the ALJ knew, Plaintiff might have been abstinent during the 2010 and 2011 periods when he saw Dr. Osei and Dr. Conrad, then started to drink once again by the 2012 administrative hearing. Tincher never claimed that he had stopped drinking altogether. In fact, he told the ALJ that he drank on a weekly basis as of the 2012 hearing. (R. 69). Any conclusion that Ms. Hansel's testimony posed a fatal contradiction to statements made to the consulting physicians was speculative in the absence of the ALJ's inquiry on the subject.

Moreover, the ALJ failed to note that Plaintiff told both her and Dr. Conard that he used alcohol as a form of self-medication for the symptoms of his mental illness. The ALJ should have been aware that, if Plaintiff drank to ease his anxiety and bipolar symptoms, it would be not be surprising for his drinking habits to fluctuate from time to time. The Seventh Circuit has stated again and again that the symptoms of mental illness are episodic. *Kangail*, 454 F.3d at 629; *Punzio*, 630 F.3d at 710 ("[A] person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition."). *See also* SSR 96-7p ("Symptoms vary in their

11

intensity, persistency, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms."). The fact that Plaintiff may have stopped and started drinking, or may have engaged in more serious drinking episodes from time to time, is fully consistent with the fluctuating nature of his disorders. If the ALJ thought that his various statements on the matter were so inconsistent as to render him non-credible, she should have made some attempt at the hearing to elicit testimony from this unrepresented claimant.

The ALJ did not think that Plaintiff was attempting to mislead her with these alleged inconsistencies; she concluded instead that they cast doubt on the reliability of other claims that he made. (R 30). This overlooks, of course, that Tincher's mother confirmed at least some of his statements at the hearing. She told the ALJ that he was paranoid, hid all day at home, and spent most of his time watching TV. (R. 71-73). That was consistent with what Plaintiff told the ALJ. The Court recognizes that "[i]t is for the ALJ to determine the significance of any particular inconsistency." *Masters v. Astrue*, 818 F. Supp.2d 1054, 1070 (N.D. Ill. 2011). In this case, however, the ALJ did not clearly establish that the inconsistency she relied on actually existed. That fact, combined with the ALJ's faulty reasoning on all other aspects of Plaintiff's credibility, requires remand. Plaintiff's motion is granted on the credibility issue.

### B.     The RFC Assessment

The ALJ found that Plaintiff could perform a full range of work at all exertional levels as long as he was limited to "work involving simple tasks and . . . no contact with the general public, and only occasional contact with co-workers and supervisors." (R. 31). She

justified these non-exertional restrictions by finding that Plaintiff's bipolar disorder did not prevent him from paying attention for extended periods. She also gave great weight to the Psychiatric Review Technique findings ("PRT") and RFC conclusions of state-agency experts Dr. David Voss and Dr. John Tomassetti.

Dr. Voss issued his report in September 2010. He did not think that sufficient evidence existed to identify any mental disorder. He also made no findings concerning Tincher's functional limitations. Notwithstanding, Dr. Voss went on to conclude that Plaintiff could only carry out one and two-step tasks; perform simple work at a consistent pace; and should have minimal contact with co-workers and the public. (R. 409-25). Dr. Tomassetti's report was issued in April 2011. He found that Plaintiff suffered from bipolar disorder and alcohol dependence. Dr. Tomassetti concluded that Plaintiff had mild limitations in his ADLs, with moderate restrictions in social functioning and concentration, persistence, and pace. He stated that Plaintiff could engage in "routine unskilled activities in situations where close social contacts are minimal." (R. 460). Unlike Dr. Voss, Dr. Tomassetti did not restrict Plaintiff to one and two-step tasks. The ALJ gave both reports "great" weight.

The Court agrees with Plaintiff that the ALJ failed to build a logical bridge between the record and her RFC conclusions. It is entirely unclear, for example, how she decided that both state-agency experts deserved great weight when they provided incompatible assessments of Plaintiffs' mental impairments. Dr. Voss found no impairments; Dr. Tomassetti found two. The ALJ agreed with Dr. Tomassetti on almost all points while, at the same time, giving equal weight to Dr. Voss. The ALJ was required to explain why she gave great weight to Dr. Voss when, in fact, she rejected his conclusion that there was insufficient evidence to find a mental impairment or functional limitations during Plaintiff's

13

disability period. The more reasonable conclusion is that she actually gave no weight at all to Dr. Voss despite her claim to the contrary.

The Commissioner defends the ALJ's illogical reasoning by claiming that her adoption of Dr. Tomassetti's findings were "to Tincher's benefit." (Dckt. 22, p. 5 at n.1). This appears to be some form of harmless error analysis that the government has not fully articulated. The Court states the issue hesitantly because the Commissioner's point is, frankly, opaque. The government does not concede that the ALJ committed any error at all, harmless or otherwise. Nevertheless, the Court assumes that the Commissioner is claiming that, even if the ALJ's consideration of Dr. Voss was misguided, she was still entitled to rely on Dr. Tomassetti to reach her findings. Plaintiff disagrees by pointing out that Dr. Voss restricted Tincher to simple one and two-step tasks. (R. 425). Plaintiff argues that the ALJ was required to account for what he claims is a more restrictive RFC than the one in Dr. Tomassetti's PRT.

The issue is more simply addressed than either party states. The fundamental question is always whether substantial evidence supports the RFC that the ALJ articulated. *See Warner v. Astrue*, 880 F. Supp.2d 935, 944 (N.D. Ind. 2012) ("At bottom, an ALJ is free to formulate his mental [RFC] assessment in terms such as "able to perform simple, routine, repetitive work" so long as the record adequately supports that conclusion.") (internal quotes and citation omitted). The Court easily concludes that the ALJ failed to state sufficient reasons to support her RFC. Three grounds support that conclusion.

First, even assuming that her illogical consideration of Dr. Voss was harmless error, the ALJ failed to explain why Dr. Tomassetti deserved great weight. Error on that issue is very serious indeed. The ALJ's only stated reason for her conclusion was that Dr.

Tomassetti noted that Tincher "has not sought any treatment for his mental health issues." (R. 34). That is without merit. As discussed above, the ALJ failed to consider basic issues on why Plaintiff did not seek out more aggressive treatment for his severe mental disorders. If the ALJ could not rely on the fact that Plaintiff did not pursue treatment to discredit his testimony, she certainly could not rely on the same reasoning to give great weight to Dr. Tomassetti's report. Thus, the ALJ's sole basis for adopting Dr. Tomassetti's report (including his RFC) lacks any merit.

Second, the ALJ was not entitled to evaluate Dr. Tomassetti's report without also accounting for the report of consulting expert Dr. Jacobs. The two reports presented conflicting descriptions of Plaintiff's condition. Dr. Jacobs found that Plaintiff suffered from both bipolar disorder and "panic disorder without agoraphobia (while abstaining from alcohol)."[1] (R. 403). Indeed, Dr. Jacobs believed that Plaintiff's panic disorder was more significant than the bipolar issue. (R. 402). By contrast, Dr. Tomassetti did not think that Tincher had a panic disorder.[2]

The ALJ adopted Dr. Tomassetti's conclusions without explaining why she set aside Dr. Jacob's expert findings on panic disorder. The ALJ was required to weigh the consulting psychologist's report. *See Ottman v. Barnhart*, 306 F. Supp.2d 829, 837 (N.D.

---

[1] This suggests that Plaintiff had agoraphobic symptoms when he did drink. Both Tincher and his mother told the ALJ that he experienced such symptoms by refusing to leave the house on some days. The ALJ never considered that issue as part of her credibility assessment. She is instructed to do so on remand.

[2] Panic disorder and bipolar disorder are separate psychiatric diagnoses under listings 12.04 and 12.06. The ALJ mistakenly identified bipolar disorder at Step 3 as falling under listing 12.06 (anxiety disorders). (R. 30). Bipolar disorder is an affective disorder that comes within listing 12.04, as Dr. Tomassetti stated in his PRT. (R. 44). The ALJ shall identify the correct listing on remand.

Ind. 2004) ("[U]nder the Social Security regulations, an ALJ must consider every medical opinion he receives.") (citing 20 C.F.R. § 404.1527(d)). The ALJ never weighed Dr. Jacob's opinion or explained why she did not agree with it. As an examining expert, Dr. Jacobs was entitled to greater weight than Dr. Tomassetti unless the ALJ stated cogent reasons for reaching a different conclusion. The regulations advise ALJs that they are required to "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not." 20 C.F.R. § 404.1527(d)(1). *See also Criner v. Barnhart*, 208 F. Supp.2d 937, 954 (N.D. Ill. 2002) ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.") (internal quote and citation omitted). The ALJ could not assign great weight to Dr. Tomassetti without first complying with this well-established obligation.

Even if the ALJ had valid reasons for finding that Plaintiff's panic disorder was not a severe impairment, she was still required to account for its effects on his RFC. "When determining a claimant's RFC, the ALJ must consider the combined effect of all impairments, even those that would not be considered severe in isolation." *Alesia v. Astrue*, 789 F. Supp.2d 921, 933 (N.D. Ill. 2011) (internal quotes and citation omitted). If the ALJ did not believe that Dr. Jacob's diagnosis was reliable, then she was obligated to resolve the conflict between his report and Dr. Tomassetti's. *See Worzalla*, 311 F. Supp.2d at 788. This would have required the ALJ to cite medical evidence to show that Dr. Jacobs was incorrect. "An ALJ . . . is not only allowed to, he must, [sic] weigh the evidence, draw appropriate inferences from the evidence, and, where necessary, resolve conflicting medical evidence." *Thorps v. Astrue*, 873 F. Supp.2d 995, 1005 (N.D. Ill. 2012). ALJ

Olivero failed to comply with this duty.

Third, the ALJ's flawed credibility analysis prevented her from supporting the RFC with reasonable conclusions drawn from Plaintiff's testimony. Social Security Ruling 96-8p instructs ALJs to consider a claimant's ADLs as part of the RFC assessment. The ALJ's errors on the issue are discussed above. She gave no cogent explanation of why a person suffering from bipolar disorder "can pay attention for extended periods" (R. 34) because he watches TV all day and looks at a computer for two hours. She also failed to consider the fluctuating nature of the symptoms that a mentally ill, bipolar claimant like Plaintiff could be expected to experience.

Equally important, the ALJ overlooked entirely that Plaintiff testified that he needed to lie down for up to three hours every day. SSR 96-8p requires an ALJ to provide a narrative discussion of "the individual's ability to perform sustained work activities in an ordinary work setting on a regular basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)[.]" The ALJ never considered that important testimony in the credibility assessment. An ALJ errs when the RFC fails to account for a claimant's allegation that he needs to lie down. *See Hurley v. Colvin*, 2014 WL 939441, at *16 (N.D. Ind. March 10, 2014).

The Commissioner claims that the ALJ was justified because the objective medical record does not confirm Plaintiff's allegation. That fails on two grounds. First, the Commissioner defends the ALJ's decision on grounds that she did not raise. That is strictly forbidden. The ALJ did not rely on the medical record to discredit Plaintiff's allegations on this issue; she simply ignored it. In addition, SSR 96-8p plainly states that "[c]areful consideration must be given to any available information about symptoms because

17

subjective descriptions may indicate more severe limitations than can be shown by objective medical evidence alone." The absence of objective evidence is relevant, but it does not relieve an ALJ of her duty. An ALJ is not entitled to assess the RFC by relying on the absence of objective evidence alone. *See Ibarra-Montafur v. Colvin*, 2013 WL 2384265, at *10 (N.D. Ill. May 30, 2013) (addressing the need to lie down); *see also Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 20120 ("An ALJ may not reject a claimant's testimony about limitations of his daily activities solely because his testimony is unsupported by the medical evidence."). Plaintiff's motion is granted on the RFC issue.

## Conclusion

For all these reasons Plaintiff Anthony Tincher's Motion for Summary Judgment [17] is granted. The Commissioner's Motion for Summary Judgment [21] is denied. The Commissioner's decision is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

Date: July 14, 2015          ENTER:

                             Daniel G. Martin
                             United States Magistrate Judge

18